WHITE *v*. STATE OF INDIANA.

[No. 867S74. Filed August 22, 1968.]

*Chester H. Wilson,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, and *John F. Davis,* Deputy Attorney General, for appellee,

PER CURIAM—This is an appeal by the appellant from the judgment of the Circuit Court of Lawrence County, after a jury had convicted the appellant of the crime of assault and battery with intent to kill. In its verdict the jury recommended clemency.

After a pre-commitment investigation the appellant was sentenced to the Indiana State Prison for an indeterminate term of not less than two (2) year nor more than fourteen (14) years.

In his motion for a new trial the appellant urged three grounds: the finding of the court is contrary to law; that the finding of the court is not sustained by sufficient evidence; alleging that the evidence reflects the appellant fired upon the deceased after the deceased had fired upon the defendant on the defendant's premises, and that the defendant acted in self-defense, and that the act on the part of the defendant was justifiable homicide.

The facts most favorable to the state are these: The appellant testified that when he and the people who were with him were accosted or threatened by the deceased, he was on his father-in-law's premises. Appellant further testified that after he and the people with whom he had been were threatened by the deceased, defendant went home, armed himself and returned. When the deceased returned to where appellant was, the deceased reached into his car and pulled out a shotgun which the deceased had taken from the home of his brother, which the evidence shows was a 12-gauge shotgun with eight (8) shotgun shells. There was testimony that the deceased did not own a gun, nor did he take a .22 caliber rifle from the home of his brother.

There was no testimony that a shotgun was fired, and the investigating officer at the scene testified that the shotgun was still loaded, and eight (8) shotgun shells were found with it, and the gun had not been fired.

Testimony was conflicting as to who fired the first shot or

as to whether deceased fired any shot at all. There was testimony that when the deceased ran from his car he dropped a shotgun which was found lying along side of deceased's car.

There was further testimony that the deceased was found to have been shot in the *back of the head*. This was corroborated by the doctor who performed the autopsy. The defendant admitted that the deceased was running away from his direction when the appellant fired a second shot. Appellant further admitted that deceased had his back to him when he fired the second time. The testimony reads as follows:

"Q. Well, at the time you shot him, he had his back to you, didn't he?
A. He might have had, yes.
Q. Well, he was shot in the back of the head, wasn't he?
A. Yes."

The stepson of the appellant and a witness for the appellant corroborated the above by his testimony that the deceased was running away from the defendant when he was shot as follows:

"Q. Did your father, step-father shoot at him while he was running?
A. I can't remember that.
Q. Which direction was Bernard Mundy running, toward your father, step-father or away from him?
A. Away from him."

Appellant admitted that he had been in trouble previous to the incident for using a deadly weapon.

"A. Yes sir. That was right after I got out of service and I started running around with this buddy of mine that I knew in service and well, we just run around one night drinking and he suggested we rob a place, and he, I think he even told me how to do it and I did. I robbed the street car operator in Indianapolis.
Q. What kind of weapon did you use?
A. Let's see. I believe it was a .38 automatic."

The evidence is not in conflict that the appellant shot and killed the deceased; nor has the appellant questioned that death caused by the use of a deadly weapon can support a presumption of malice and intent. Appellant's main argument is that of self defense.

This court has held, on appeal, it will not weigh conflicting evidence, but will consider only that evidence most favorable to appellee. *Bange* v. *State* (1958), 237 Ind. 422, 146 N. E. 2d 811.

"Whether or not appellant herein shot and killed the deceased in self defense was an ultimate fact solely for the determination of the jury from the evidence in this case. *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192, 72 A.L.R. 891; *Ellis* v. *State* (1899), 152 Ind. 326, 330, 52 N. E. 82; *Buffkin* v. *State* (1914), 182 Ind. 204, 207, 106 N. E. 362; *King* v. *State* (1918), 187 Ind. 220, 221, 118 N. E. 809; *Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205, 207 (Cert. denied (1955), 349 U. S. 932)."

It may have been proper for the appellant to arm himself after the threat by the deceased, and it may have been proper for the defendant to have fired the first shot acting in self defense. When, however, the deceased dropped his shotgun by his car, where it was found later, and ran unarmed away from the defendant and the defendant shot him in the back of the head while he was fleeing, the defendant was not acting in self defense at that time.

"One can not, after his enemy has cast his weapon and turned to fly, kill him and successfully claim to have been acting in self defense. This also disposes of the claim that the evidence is not sufficient to sustain the verdict." *Meurer* v. *State* (1891), 129 Ind. 587, 589, 29 N. E. 392.

It is to be noted that after the jury returned its verdict the attorney for the appellant did not poll the jury nor make any motion to correct the form of the verdict, nor did he raise any question as to the verdict of the jury in his motion for a new trial. In his brief on appeal, however, appel-

lant states that the verdict of the jury recommends clemency which recommendation was not carried out by the court, and contends further that the trial court should have shown leniency when the jury recommended clemency in its verdict. The verdict of the jury reads as follows:

"We, the Jury, find the defendant, Paul White, Guilty of Assault and Battery with Intent to Kill, as charged in the indictment, and that his true age is 39 years. (Filling in the number of years you find the defendant to be.) The jury recommends clemency."

The phrase in the verdict set forth above "the jury recommends clemency," is in effect surplusage and of no effect in law. See *Mahok* v. *State* (1931), 202 Ind. 473, 174 N. E. 281.

In the case of *Smith* v. *State* (1965), 6 Ind. Dec. 694, 247 Ind. 126, 211 N. E. 2d 186, there was no objection at the time of the return of the verdict as to any alleged defect therein. There the court pointed out that one may not fail to make objection during the trial at the proper time when the alleged error, if any, is too late to remedy such alleged error, predicate and rely in his appeal on said error.

In the case of *Callender* v. *State* (1923), 193 Ind. 91, 138 N. E. 817, defendant was tried on two indictments returned by the grand jury. On one indictment the jury returned a verdict of not guilty; on the second, the jury returned a verdict finding defendant guilty as charged, assessed his punishment at a fine and imprisonment for a period of 60 days as follows:

"We, the jury, find the defendant guilty as charged in the indictment and assess his punishment at a fine of $100 and that he be imprisoned in the Elkhart county jail for a period of sixty (60) days and we, the jury, petition your honor to suspend the jail sentence during good behavior."

This is very similar to the case on appeal. The court held that the verdict of the jury is not uncertain and ambiguous.

It further found that the clause in which the jury asked that the jail sentence be suspended was, in effect, merely a petition for clemency and in no sense a part of the verdict. The court stated: "It was improper to place this petition in the verdict, but it does not affect the verdict in any way and is not harmful to the appellant."

The judgment of the lower court is affirmed.

Jackson, J., dissents with opinion.

Mote, J., not participating.

## DISSENTING

JACKSON, J.—I am unable to agree with the majority opinion herein as written and dissent thereto.

Appellant was charged by indictment with the crime of manslaughter. Such indictment, omitting formal parts thereof and signatures thereto, in pertinent part reads as follows, to-wit:

"The Grand Jurors of Lawrence County, in the State of Indiana, good and lawful men, duly and legally impaneled, charged and sworn to inquire into felonies and certain misdemeanors in and for the body of said County of Lawrence in the name and by the authority of the State of Indiana, on their oath present that one Paul White late of said County, on the 13th day of July A.D. 1966, at said County and State aforesaid did then and there unlawfully, feloniously, purposely and voluntarily, but without malice, did kill one Bernard Mundy, a human being, by then and there unlawfully, feloniously, purposely, but without malice, shooting at and against the said Bernard Mundy, with a certain pistol loaded and charged with gun powder and a lead bullet, and thereby mortally wound the said Bernard Mundy, of which said mortal wound the said Bernard Mundy then and there died, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Indiana."

Thereafter, on February 6, 1967, appellant and his counsel appeared, waived arraignment, entered a plea of not guilty and requested trial by jury.

This cause came on for trial before a jury on May 16, 1967, and was continued on May 17th and 18th, 1967. At the conclusion of which the jury returned its verdict, which reads as follows:

"We, the Jury, find the defendant, Paul White, Guilty of Assault and Battery with Intent to Kill, as charged in the Indictment, and that his true age is 39 years. The jury recommends clemency."

The court thereupon fixed June 5, 1967, at 9:30 a.m. as the time for sentencing of defendant and ordered the Probation Officer of the Lawrence Circuit Court to make and submit to the court prior to said time a pre-commitment investigation in this cause. Defendant was released on bond heretofore given and ordered to appear at 9:30 a.m. June 6th (sic) for sentencing.

On June 5, 1967, after "having seen and examined and considered the pre-commitment investigation and report heretofore made by the Probation Officer" the court sentenced appellant to the Indiana State Prison for an indeterminate term of not less than two years and not more than fourteen years and that he pay and satisfy the costs and charges herein. Afterward, on June 6, 1967, appellant filed his motion for a new trial on the following grounds:

"(1)

That the finding of the Court is contrary to law.

(2)

That the finding of the Court is not sustained by sufficient evidence.

(3)

That the evidence reflects that the defendant fired upon the deceased Bernard Mundy after Bernard Mundy fired upon the defendant on his premises, defendant's premises, and that the defendant acted in self-defense, that the act on the part of defendant was justifiable homicide."

The court thereupon after having seen and inspected said motion and being duly advised overruled appellant's Motion for a New Trial. Thereupon appellant requested the court to fix an appeal, which was fixed in the penalty of $3,000.00, and thereafter filed by appellant and approved by the court.

Appellant's Assignment of Errors is the single specification:

"The trial court erred in overruling appellant's motion for new trial."

The evidence in this cause may be summarized as follows:

On July 13, 1966, the weather was hot and on that evening between the hours of ten and eleven o'clock appellant, his wife, Flossie Mundy, Donnie Jones, Raymond Hopper, James Blackburn, Galinda Blackburn (now Galinda Jones) and the children of some of the parties were sitting under and around a huge tree in the yard on the premises owned by appellant's father-in-law. Appellant's house was adjacent to his father-in-law's, the two being only ten or twelve feet apart.

At about 11:30 that evening the decedent, Bernard Mundy, drove up and parked his car by his house on the east side of the street, which was on the opposite side of the street from appellant's home. Decedent then walked up to the group sitting in the yard, slapped his wife and said, "God damn you, I think it's time you get your ass home." No one in the group said anything to decedent either before or after he slapped his wife. Decedent then grabbed a set of wagon wheels from the ground and said, "If any of you others want to do anything about this just stand up or open your mouth." No one replied. He then threw down the wheels, began cursing and walking toward the street and said, "Alright, I'm going to go up town and get a gun and blow all your god damned brains out on this hill." Decedent then went to his car, got in and drove off. His wife and their young son went home. The rest of the group remained, and continued talking while the children played. Fearing the decedent intended to carry out his

threat, appellant went into his house, got a gun, put it into his pocket and then returned to the group and sat down again.

Approximately fifteen or twenty minutes after making the threat decedent returned to his home. He parked his car, got out and went into his house. He remained in the house for a short time before going back out and turning on the back porch light. Decedent then went to his car, opened the door, moved down the side of the car opposite the driver's side, and leveled a gun at the group in the yard. One witness testified that he assumed the gun was a shotgun. Other witnesses present testified that the gun pointed at the group was a .22 caliber rifle. There is substantial evidence, however, that the first shots were fired from the vicinity of decedent's car, and came from either a pistol, or a rifle. Moreover, it is undisputed that the decedent was the one firing the weapon.

After being fired upon, appellant fired a shot above decedent's head. One of appellant's children then said, "Look out, Dad, he is going to shoot again." Appellant then fired a second shot directly at decedent. At that time decedent was moving diagonally between the car and a shed. At the second shot decedent seemed to have jumped into the weeds and disappeared. Appellant, holding a .32 automatic pistol in his hand, then told a member of the group to get the police.

The police arrived and a search was made for the decedent. He was not found, however, and the police left. Later, Hayden Dale Mundy, decedent's brother, went looking for him. He found decedent's body in the weeds, not far from decedent's car. A loaded .12 gauge shotgun, which had not been fired, was found by the car. Mundy testified that he loaned decedent a shotgun earlier that evening.

An autopsy was performed and the cause of death was attributed to a bullet that was lodged in decedent's head. The entrance hole was a little over one inch above the top level of the ear and approximately three inches posterior to the ear. The bullet was identified as having been fired from appel-

lant's gun, and medical testimony disclosed that it was fired from some distance away.

Appellant's defense to the action is that he took only those steps necessary to protect his family and friends from the imminent danger of death or wounding at the hands of decedent. He contends that he was in the yard of his father-in-law's home, a place where he had a right to be, and that while there he, his family and friends were threatened with bodily injury by decedent who, partially intoxicated, had just slapped and cursed his wife. Decedent left, but threatened to return and kill everyone in the yard. There is no evidence that appellant or any member of the group did or said anything that would tend to provoke decedent. Decedent did return and fired a gun directly at the group in what appeared to be an obvious attempt to make good his threats. Fearing for the safety of his family and friends, as well as himself, appellant fired his gun toward decedent. Appellant contends, and it appears from the record that he acted only to silence the danger that threatened the lives of all those present.

The evidence in this case is unusual in that it is totally devoid of any record of ill feeling, quarrels, arguments or disagreements having ever existed between appellant and decedent or decedent and any person there present on the night of July 13, 1966. The evidence is undisputed that there was or had been a close and friendly association between appellant and decedent; that appellant had helped decedent obtain work, had permitted decedent and his wife to live with him and his wife in their home while helping decedent get a job, the families visited back and forth and that never since they had known each other had they had an argument or ill feeling between them.

The majority opinion states "[t]his court has held, on appeal, it will not weigh conflicting evidence, but will consider only that evidence most favorable to appellee." *Bange* v. *State* (1958), 237 Ind. 422, 146 N. E. 2d 811.

The *Bange* case also says:

"Whether or not appellant herein shot and killed the deceased in self defense was an ultimate fact solely for the determination of the jury from the evidence in this case. *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192, 72 A.L.R. 891; *Ellis* v. *State* (1899), 152 Ind. 326, 330, 52 N. E. 82; *Buffkin* v. *State* (1914), 182 Ind. 204, 207, 106 N. E. 362; *King* v. *State* (1918), 187 Ind. 220, 221, 118 N. E. 809; *Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205, 207 (Cert. denied (1955), 349 U. S. 932)."

This Court has recently held:

Where one has taken the life of another human being, and thereafter contends that he did so in self defense, he can only be successful in his contention if:
   (1)   he acted without fault,
   (2)   he was in a place where he had a right to be, and
   (3)   he was in real danger of death or great bodily harm, or in such apparent danger as caused him in good faith to fear death or great bodily harm. *Bullard* v. *State* (1964), 245 Ind. 190, 195 N. E. 2d 856, Rehearing Denied 197 N. E. 2d 295; *Hightire* v. *State* (1966), 247 Ind. 164, 213 N. E. 2d 707.

The burden is upon the State to show that defendant does not meet one or more of these requirements. *Dorak* v. *State* (1915), 183 Ind. 622, 109 N. E. 771. Whether the State has borne its burden of showing that the homicidal act was not carried out in self defense is a question of ultimate fact to be decided by the jury. *Robinson* v. *State* (1962), 243 Ind. 192, 184 N. E. 2d 16.

After the jury has made this determination in favor of the State and against the defendant, this Court, on appeal,

". . . has upon it a duty to consider, not to weigh the evidence in the case for the purpose of determining whether there is any substantial evidence of probative value from which a jury reasonably could have inferred that the appellant was guilty of the offense charged." *Robinson* v. *State* (1962), 243 Ind. 192, 184 N. E. 2d 16, 18. See Also: *Easton* v. *State* (1967), 248 Ind. 338, 228 N. E. 2d 6; *Baker* v. *State* (1956), 236 Ind. 55, 138 N. E. 2d 641; *King* v. *State* (1968), 249 Ind. 699, 234 N. E. 2d 465.

A careful reading of the evidence adduced by the State and the appellant conclusively shows that a shot or shots were first fired by decedent toward the group of which appellant was a part, and that the shots came from either a rifle or a pistol. No one contends that decedent fired a shotgun at the group. All of the testimony was as to decedent firing a rifle or pistol. Yet, the State could only produce an unfired, fully loaded shotgun. There remains the unanswered question of what happened to the rifle or pistol with which decedent shot at the group? The burden is on the State to come forward with the answer. There was competent and reliable evidence that a rifle or pistol was being used by decedent at the time of the shooting. The state, however, failed to account for this weapon even after competent and reliable witnesses stated that decedent used a rifle or a pistol in shooting at them. Moreover, since the testimony is to the effect that decedent did fire upon them with such a weapon, it is uncontradicted that decedent had a rifle or pistol in his possession at the time of the shooting. I submit that the State, in gathering evidence, must gather all the evidence relevant to the case. It may not, by failing to produce all the evidence, give rise to inferences adverse to a defendant. When logic and reason dictate the probable existence of evidence sufficient to establish the innocence of the accused, the State may not rest its investigation when it has uncovered only that evidence which, standing alone, would be sufficient for a conviction. Although the State has the duty of prosecuting criminals, it has the companion duty of insuring that justice is done. As was said by the Supreme Court of New Jersey in *State* v. *Johnson* (1958), 28 N. J. 133, 145 A. 2d 313:

"We have stressed the obligation of the State to be as vigilant in the vindication of the innocent as it must be in the prosecution of the guilty." 145 A. 2d 313, 319.

In the case before us it is clear that the State was less than vigilant in its investigation. By failing to account for the rifle or pistol that eye witnesses placed in decedent's possession at the time of the incident, and with which they

testified that he fired upon them, the State is improperly creating an inference adverse to appellant's claim of self-defense.

I am in disagreement with the statement in the majority opinion to the effect "nor has the appellant questioned that death caused by the use of a deadly weapon can support a presumption of malice and intent." In the first place malice is not an element in the affidavit in the case at bar. The affidavit specifically excludes malice. The statment is inappropriate as being beyond the issues and facts in the case at bar and is incorrect. The correct statement is that the use of a deadly weapon against AN UNARMED PERSON in a manner likely to produce death is sufficient evidence for the jury to conclude that malice existed. *Sparks* v. *State* (1964), 245 Ind. 245, 195 N. E. 2d 469; *Sparks* v. *State* (1964), 245 Ind. 250, 196 N. E. 2d 748; *Warren* v. *State* (1963), 243 Ind. 508, 188 N. E. 2d 108; *Miller* v. *State* (1962), 242 Ind. 678, 181 N. E. 2d 633, and cases cited.

I am also in disagreement with that part of the majority opinion reading as follows:

"When, however, the deceased dropped his shotgun by his car, where it was found later, and ran unarmed away from the defendant and the defendant shot him in the back of the head while he was fleeing, the defendant was not acting in self defense at that time.

'One can not, after his enemy has cast his weapon and turned to fly, kill him and successfully claim to have been acting in self defense. This also disposes of the claim that the evidence is not sufficient to sustain the verdict. *Meurer* v. *State* (1891), 129 Ind. 587, 589, 29 N. E. 392.' "

In the first place the State has failed to show what became of the rifle or pistol from which came the shot or shots directed at the group sitting under the tree, including appellant. Secondly, I submit that, search the record as you will, nowhere will you find any evidence, until after decedent's body and

the shotgun were found, the decedent had dropped the gun before being shot. Moreover, the record is completely barren of any evidence that appellant was aware that decedent dropped his gun, if in fact he did.

This Court has heretofore laid down the rule relative to self-defense. In the case of *Trogdon* v. *State* (1892), 133 Ind. 1, 32 N. E. 725, this Court said:

". . . if the assault of the attacking party be of such a character and so imminent as to warrant the party assaulted, considering his situation and apparent surroundings, to believe that he is in danger of the loss of life or great bodily harm, and he does so believe, he may without delay use such means as may be at hand and reasonably seem to him to be necessary to repel the apprehended danger or attack, and, if death follows as a result thereof, he will not be guilty of an unlawful homicide; and if, in such case, the danger appears to be real, and is reasonably believed by him to be so, the fact, if such be the fact, that the danger was not real, but only apparent, and in fact he was not in danger, such fact would not render him guilty, for the question of apparent necessity, as well as the amount of force necessary to employ to resist an attack, can only be determined from the standpoint of the defendant at the time, and under all the existing circumstances."

I submit, that considering, not weighing, the evidence in the case at bar discloses there is no substantial evidence of probative value from which a jury reasonably could have inferred that the appellant was guilty of the offense charged.

I further submit that the jury well knew the facts as adduced by the evidence did not warrant the return of the guilty verdict and attempted to ameliorate their action by their statement "[t]he jury recommends clemency."

It was not necessary for appellant to poll the jury or to make a motion to correct the form of the verdict. The holding of the court in the cases cited, *Mahok* v. *State* (1931), 202 Ind. 473, 174 N. E. 281; *Smith* v. *State* (1965), 247 Ind. 126, 6 Ind. Dec. 694, 211 N. E. 2d 186, and *Callender* v. *State* (1923), 193 Ind. 91, 138 N. E. 817, may be appropriate in

those cases, but they are not controlling in the case at bar. The recommendation of clemency clearly and unequivocally indicates the knowledge of that jury that there was, and as disclosed by the record, is no substantial evidence of probative value to sustain their verdict. That portion of the verdict is not surplusage, nor is it of no effect. Neither is it "a petition for clemency and in no sense a part of the verdict." It was not "improper to place . . . in the verdict." It does affect the verdict and "it is not harmful to the appellant." It, in fact, under the circumstances as they exist in the case at bar, is a confession of error by the jury, an admission that they should not have returned a verdict of guilty.

The judgment below should be reversed and the cause remanded with instructions to sustain appellant's Motion for New Trial.

NOTE.—Reported in 239 N. E. 2d 577.